## AFFIDAVIT OF BRYAN J. AXELROD

I, Bryan J. Axelrod, being duly sworn, state under oath as follows:

## INTRODUCTION

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI") and have been so employed since March 1, 2020. I am currently assigned to the North Shore Gang Task Force ("NSGTF") responsible for investigating gang related crimes in the Merrimack Valley region of Massachusetts. Prior to my career with the FBI, I was employed with the Gallatin County Sheriff's Office as a Deputy Sheriff in Gallatin County, Montana from June 2014 to August 2019. During my law enforcement career, I have been involved in the investigation of homicides, firearm violations, and violation of drug offenses, including drug distribution. I have conducted numerous investigations and arrests involving drug offenses and other violent crimes.

2.      As a Special Agent, I am a "Federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      During my law enforcement career, I have received specialized training regarding the activities of drug and firearm traffickers, including the methods used to package, store, and distribute drugs and distribute firearms, and the methods used by drug and firearm traffickers to conceal and launder the proceeds of their drug and firearm trafficking activities.

4.      In addition to my training, I have experience in the investigation of the activities of drug and firearm traffickers.  Over the course of my assignment with the FBI and my career as a police officer, I have participated in numerous controlled substances and firearm investigations as a lead investigator and in a supporting role. I have debriefed defendants, informants, and witnesses with personal knowledge about drug and firearm trafficking activities and the operation of drug

1

trafficking organizations and illegal firearm distributors. I personally have participated in all aspects of drug and firearm trafficking investigations, including conducting surveillance, using confidential informants, and executing search warrants.

5.      Furthermore, I have participated in numerous arrests for distribution and sale of illegal drugs. These drug transactions include a wide-ranging assortment of controlled substances, including fentanyl, cocaine, cocaine base, oxycodone, and methamphetamine, and ranged in quantity from small "street-level" purchases to larger "trafficking" weight purchases.

6.      On the basis of my training and experience, I am familiar with the vernacular of illegal drug abusers and distributors of drugs and firearms. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances and sell firearms.

7.      I have participated in the below-described investigation since March 2021. I submit this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    a.  My training and experience investigating drug-trafficking crimes;

    b.  Oral reports, written reports, and documents that I have received from FBI and other federal, state, and local law enforcement agents;

    c.  Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

    d.  Confidential sources of information;

    e.  Public records;

f.   Business records;

g.   Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

h.   Controlled purchases of narcotics;

i.   Evidence obtained from consensually-recorded wire and electronic communications;

j.   Queries of law enforcement records and intelligence databases;

k.   Execution of search warrants and tracking warrants; and

l.   Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

### PURPOSE OF AFFIDAVIT

8.   I am submitting this affidavit in support of:

a.   An application for the issuance of a criminal complaint charging Esaias GILL-GONZALEZ, Domingo LUGO DIAZ, Cote COLBY, and Keith LANE with conspiracy to distribute and possess with intent to distribute controlled substances involving fentanyl, cocaine base, and methamphetamine, in violation of 21 U.S.C. § 846;

b.   An application for the issuance of a search warrant authorizing the search of 4 Allyn Terrace, Lawrence, Massachusetts (hereinafter, "Target Location 1"). A complete description of the property to be searched is set forth in Attachment A-1, which is attached hereto and incorporated herein; and

c.   An application for the issuance of a search warrant authorizing the search of 83 Oxford Street, Lawrence, Massachusetts (hereinafter, "Target Location 2"). A complete description of the property to be searched is set forth in Attachment A-2, which is attached hereto and incorporated herein; and

Collectively, Target Locations 1 and 2 are referred to as the "Target Locations."

9.   As further discussed below, there is probable cause to believe that between September 2022 and present, Esaias GILL-GONZALEZ, a/k/a Skitz, a/k/a Skillz ("GILL-

GONZALEZ"), Domingo LUGO DIAZ ("LUGO DIAZ"), Cote COLBY ("COLBY"), Keith LANE ("LANE"), and others known and unknown conspired to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. Further, there is probable cause to believe that 1) GILL-GONZALEZ resides at Target Location 1 and keeps records and evidence of his drug conspiracy at Target Location 1; and 2) LUGO DIAZ resides at Target Location 2 and keeps records and evidence of his drug conspiracy at Target Location 2.

10.     As a result, I submit that there is probable cause to believe that the Target Locations contain records and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Locations there is evidence of the Target Offenses, as described in Attachments B-1 and B-2.

11.     Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Locations, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested complaint and search warrants.  All times herein are approximate. Some of the intercepted communications discussed below were in

Spanish and have been interpreted by Spanish-speaking personnel. All quotations from intercepted communications come from preliminary transcripts.

## PROBABLE CAUSE

### Background of investigation

12.     Between at least September 2022 until present, investigators of the NSGTF have been investigating the drug distribution of GILL-GONZALEZ, LUGO DIAZ, COLBY, and LANE.  The investigation included numerous controlled purchases of narcotics from these four individuals using several cooperating witnesses. Some of these controlled purchases are detailed below.

13.     On April 3, 2023, Chief District Judge F. Dennis Saylor IV authorized the interception of wire communications to and from Target Telephones 2 and 3, and wire and electronic communications to and from Target Telephone 4. Interceptions began on April 6, 2023 and continue today. These intercepted communications corroborate that GILL-GONZALEZ, LUGO DIAZ, and COLBY are conspiring to distribute controlled substances. LANE has only recently been released from a sentence of imprisonment in Rockingham County, New Hampshire, and has not been intercepted over the Target Telephones.

14.     As discussed below, LUGO DIAZ informed a cooperating witness that his phone number is Target Telephone 2. GILL-GONZALEZ also used Target Telephones 3 and 4 during controlled purchases of drugs with cooperating witnesses, discussed below. Further, intercepted communications and precise phone location information have confirmed that LUGO DIAZ uses Target Telephone 2 and GILL-GONZALEZ uses Target Telephones 3 and 4.

GILL-GONZALEZ's residence at Target Location 1 and LUGO DIAZ's residence at Target

<u>Location 2</u>

15.     Agents know that GILL-GONZALEZ resides at Target Location 1 because Target Telephone 3 is subscribed to GILL-GONZALEZ in his name and registered to Target Location 1. Further, investigators currently have a pole camera observing the driveway of Target Location 1. On nearly a daily basis for at least the past month, investigators have observed GILL-GONZALEZ leave Target Location 1 in the morning and coming and going from Target Location 1 throughout the day. For example, on April 10, 2023 at 1:00 p.m., agents established surveillance of Target Location 1. At 1:39 p.m., agents surveilled GILL-GONZALEZ exit Target Location 1 and drive to COLBY's residence at 44 Redfield Circle, Derry, New Hampshire. Approximately 16 minutes later, GILL-GONZALEZ left COLBY's residence. Agents maintained surveillance of GILL-GONZALEZ for several hours and observed him making numerous brief stops to meet with people throughout the Merrimack Valley consistent with narcotics transactions.

16.     Agents know that LUGO DIAZ resides at Target Location 2 because he lists Target Location 2 as his residence with the Registry of Motor Vehicles. Investigators currently have a pole camera observing the street outside of Target Location 2. On the camera, agents have observed LUGO DIAZ coming and going from the area of Target Location 2 on a near daily basis for at least the past month. Further, as discussed below, LUGO DIAZ was intercepted instructing a drug supplier to send a courier to his residence at Target Location 2.

<u>September 15, 2022: GILL-GONZALEZ supplied LANE during controlled purchase of cocaine and fentanyl pills</u>

17.     On September 15, 2022, a FBI cooperating witness ("CW-3") contacted LANE, who was using phone number (603) 760-8385, and ordered fentanyl pills, cocaine base, and

cocaine.[1] CW-3 knew LANE to be a drug distributor and had LANE's contact information prior to this date. The text communications between CW-3 and LANE are preserved but were not directly supervised by agents. LANE informed CW-3 in a text message, "He only has the blues rn and 'hard' he tryna grab more blow rn." I believe that LANE informed CW-3 that his source of supply ("He") only had fentanyl pills ("blues") and cocaine base ("hard"). LANE and CW-2 agreed to meet at 2 Lafayette Road in Salisbury, Massachusetts for the deal. Prior to the meeting, agents provided CW-3 with an audio and video recording and surveillance device and $1,500 of official agency funds for the deal. Agents also searched CW-3 and CW-3's vehicle for contraband, weapons, and money with negative results.

18.     Agents then followed CW-3 to Salisbury, Massachusetts. While en-route, LANE re-directed CW-3 to meet him at 5 Trout Way in Salisbury. CW-3 met LANE outside that address and LANE entered the CW-3's front passenger seat. LANE directed CW-3 to Northern Essex Community College in Haverhill, Massachusetts to complete the deal.

19.     Upon arriving at the community college at 1:55 p.m., CW-3 overheard LANE call his source and asked if he would be arriving in the black Camry again. A few minutes later, a black Toyota Camry, bearing Massachusetts registration 3VNZ64, (the "Camry") arrived and parked a short distance from CW-3's vehicle.[2] LANE exited CW-3's vehicle and entered the front passenger

---

1 CW-3 is cooperating with law enforcement for monetary compensation. CW-3 has a criminal history including indecent assault and battery, failure to register as a sex offender, and drug possession. Information received from CW-3 has been corroborated through controlled purchases of narcotics from LANE, who is supplied by GILL-GONZALEZ. Agents conducted physical and electronic surveillance of these controlled purchases by CW-3. Based on this investigation, I believe that information received from CW-3 is reliable.

2 The Camry is registered to Xpress Car and Truck Rental and rented by GILL-GONZALEZ's girlfriend, P.M.. An employee at the rental business informed me that GILL-GONZALEZ has

seat of the Camry. Surveillance agents observed the driver to resemble GILL-GONZALEZ, who investigators knew from this investigation and his recent release from the Essex County Jail. After a moment in the Camry, LANE exited and returned to CW-3's vehicle. Inside CW-3's vehicle, LANE provided CW-3 with a plastic bag containing two smaller bags. One bag contained an off-white rock-like substance and the other bag contained blue pills. Agents surveilled CW-3 drive LANE back to Salisbury where they parted ways.

20.     Agents then surveilled CW-3 return to a pre-determined meeting location. CW-3 provided the agent with the plastic bag of suspected cocaine base and fentanyl pills to agents. The bag of suspected cocaine base field tested positive for cocaine base and the bag of blue pills tested positive for acetaminophen and inconclusive for other narcotics. The drugs were packaged and sent to the DEA drug laboratory for confirmatory analysis, which determined that the drugs were 42 grams of a substance containing cocaine base and 50 pills of a substance containing fentanyl.

<u>September 20, 2022: GILL-GONZALEZ supplied LANE with fentanyl and fentanyl pills for CW-3</u>

21.     On September 20, 2022, at the direction of investigators, CW-3 contacted LANE, who was using phone number (603) 760-8385, by text message and ordered fentanyl pills and fentanyl. The text communications between CW-3 and LANE are preserved but were not directly supervised by agents. CW-3 asked for the price of "200 blues and 3 sticks." A "stick" is a common street term for 10 grams of fentanyl. LANE replied, "3 sticks is 600 blues I'll do at like 9 a pop." I believe that LANE informed CW-3 that he would sell 30 grams of fentanyl ("3 sticks") for $600

_____

come into the office to extend the rental agreement and has paid for the extension in cash.

and fentanyl pills for $9 each ("blues I'll do at like 9 a pop"). CW-3 informed LANE that he only had $2,000 available and that he would order $1,800 worth of fentanyl pills and 10 grams of fentanyl for $200. LANE and CW-3 agreed to meet in Salisbury, Massachusetts for the deal on September 20, 2022. Prior to the meeting on September 20, 2022, agents provided CW-3 with an audio and video recording and surveillance device and $2,500 of official agency funds for the deal. Agents also searched CW-3 and CW-3's vehicle for contraband, weapons, and money with negative results.

22.     Agents followed CW-3 to 5 Trout Way in Salisbury where CW-3 had picked up LANE for a prior drug deal. CW-3 met LANE outside that address and LANE entered CW-3's front passenger seat. LANE directed CW-3 to Market Basket in Haverhill, Massachusetts to complete the deal. During the drive, at 3:51 p.m., LANE, who was using phone number (603) 760-8385, received an incoming call from GILL-GONZALEZ, who was using Target Telephone 3.[3] This call was overhead by CW-3 and confirmed through toll analysis. GILL-GONZALEZ informed LANE that he was 10 minutes away from the Market Basket.

23.     At 4:18 p.m., GILL-GONZALEZ called LANE and informed him that he was at the Market Basket. This call was overheard by CW-3 and confirmed through toll analysis. At the same time, GILL-GONZALEZ arrived in the Camry and parked a short distance from CW-3's vehicle.[4] LANE took $2,000 of the agency funds from CW-3 and went into the front passenger seat of the Camry. GILL-GONZALEZ and LANE drove around the parking lot before returning

---

3 At the time of the controlled purchase, investigators knew GILL-GONZALEZ used Target Telephone 3 because it is subscribed to him at Target Location 1.
4 Agents were familiar with GILL-GONZALEZ based on his RMV photograph and recent release from the Essex County Jail.

to the area where CW-3 was parked. LANE exited the Camry and returned to CW-3's vehicle. Inside CW-3's vehicle, LANE provided CW-3 with a plastic bag containing three smaller bags. One bag contained a tan, powdery substance and the other two bags contained blue pills. I believe that GILL-GONZALEZ supplied LANE with drugs to sell to CW-3. Agents then surveilled CW-3 drive LANE back to Salisbury where they parted ways.

24.     Agents surveilled CW-3 return to a pre-determined meeting location. CW-3 provided the agent with the plastic bag of 10 grams of a substance containing fentanyl and 199 fentanyl pills to agents. CW-3 also returned $500 of unused official agency funds. The DEA laboratory confirmed the presence of fentanyl in both the bag of fentanyl and fentanyl pills.

<u>October 26, 2022: LUGO DIAZ sold fentanyl pills to CW-1</u>

25.     On or about October 26, 2022, a FBI cooperating witness ("CW-1") contacted Individual-1 and ordered fentanyl pills.[5] During a recorded phone call, Individual-1 directed CW-1 to Oxford Street in Lawrence to complete the deal with an associate. CW-1 later learned that Individual-1 had moved out of state. Agents were familiar that LUGO DIAZ lives at 83 Oxford

---

5 CW-1 is cooperating with law enforcement for monetary compensation. CW-1 has a criminal history that includes drug possession and distribution, motor vehicle offenses, and illegal entries into the United States. Information received from CW-1 has been corroborated through controlled purchases of narcotics from Individual-1 and LUGO DIAZ. Agents conducted physical and electronic surveillance of these controlled purchases by CW-1. Based on the investigation detailed below, I believe that information received from CW-1 is reliable

Street (Target Location 2) and suspected that Individual-1 was directing CW-1 to LUGO DIAZ for the deal.

26.     Prior to the meeting, agents provided CW-1 with audio and video recording and surveillance devices and $2,000 of official agency funds for the deal. Agents also searched CW-1 and CW-1's vehicle for contraband, weapons, and money with negative results.

27.     Following the search, at 2:16 p.m., Individual-1 called CW-1 and redirected CW-1 to 14 Garfield Street in Lawrence for the deal. A few minutes after the call, agents observed LUGO DIAZ exit Target Location 2 carrying a tissue box and enter a white Infiniti with another male driving.[6] LUGO DIAZ arrived at Garfield and Boxford Street in the white Infiniti. At 2:46 p.m., CW-1 then received a call from Individual-1. Individual-1 directed CW-1 to meet with his associate in the white Infiniti. Inside the vehicle, LUGO DIAZ directed CW-1 to take the tissue box in the back seat. In exchange, CW-1 gave the official funds to LUGO DIAZ. This meeting was recorded. In the Infiniti, CW-1 asked LUGO DIAZ if he had the ounce of cocaine for CW-1. LUGO DIAZ stated that he did not and that he could get it in half an hour. LUGO DIAZ informed CW-1 that his telephone number was Target Telephone 2 and instructed CW-1 to call him. CW-1 called Target Telephone 2 to confirm LUGO DIAZ's phone number and so that LUGO DIAZ would have CW-1's phone number. LUGO DIAZ also informed CW-1 that Individual-1 was out of state.

28.     Following the deal, agents surveilled CW-1 return to a meeting location. There, CW-1 provided agents with the tissue box of 398 fentanyl pills. The fentanyl pills were poorly

---

6 Investigators are familiar with LUGO DIAZ through physical surveillance, law enforcement photographs, and his driver's license photograph.

pressed and many were crumbling into a blue powdery substance. The DEA laboratory confirmed the presence of fentanyl in the fentanyl pills.

<u>November 22, 2022: GILL-GONZALEZ and COLBY sold one ounce of methamphetamine and 20 grams of fentanyl to CW-2</u>

29.     On November 22, 2022, at the direction of investigators, a FBI cooperating witness ("CW-2") contacted COLBY to purchase one ounce of methamphetamine and 20 grams of fentanyl for $1,700.[7] CW-2 arranged the controlled purchase with COLBY, who was utilizing phone number (603) 333-4348. CW-2 knew COLBY to be a drug distributor and had COLBY's contact information prior to his cooperation with law enforcement. These communications were not directly supervised by law enforcement, but the text messages are preserved. On November 22, 2022, at 11:49 a.m., CW-2 sent a text message to COLBY, stating, "Can you grab me that zip Today we talked about and two sticks to make the blues." COLBY replied, "I have the 2 sticks." CW-2 stated, "Word can you grab the zip today." COLBY replied, "Lemme see." In this text message exchange, I believe CW-2 ordered one ounce of methamphetamine ("that zip") and 20 grams of fentanyl ("two sticks") from COLBY.

30.     Prior to the controlled purchase, agents searched CW-2 and CW-2's vehicle for contraband with negative results. Agents provided $1,700 of official agency funds and audio and

---

7 CW-2 has a criminal history including burglary, violations of probation, possession with intent to distribute and transport drugs, driving while intoxicated, and driving under the influence. CW-2 is cooperating with law enforcement for monetary compensation. CW-2 has conducted 4 controlled narcotics purchases from COLBY and GILL-GONZALEZ. Information received from CW-2 has been corroborated through controlled purchases of narcotics from COLBY. Agents conducted physical and electronic surveillance of these controlled purchases by CW-2. Based on the investigation, I believe that information received from CW-2 is reliable.

video recording and surveillance devices to CW-2. At 9:01 p.m., agents surveilled CW-2 travel to a store in Derry, New Hampshire to meet COLBY.

31.     At 9:09 p.m., agents observed COLBY approach CW-2's vehicle in the store parking lot. COLBY threw a bag of one ounce of methamphetamine onto CW-2's vehicle and asked CW-2 for $360 to pay his source. CW-2 and COLBY then went into the store to make change. CW-2 and COLBY passed GILL-GONZALEZ leaving the store, and COLBY told GILL-GONZALEZ that they would be outside shortly. Agents observed GILL-GONZALEZ exit the store and enter a black Kia Rio bearing Massachusetts registration 1HLS82 (the "Rio").[8] A few minutes later, CW-2 and COLBY left the store and returned to CW-2's vehicle. Inside the vehicle, COLBY provided CW-2 with a bag containing approximately 20 grams of suspected fentanyl. At 9:18 p.m., GILL-GONZALEZ approached CW-2's vehicle and received cash from COLBY before leaving the area.

32.     CW-2 then drove COLBY to his residence at 44 Redfield Circle in Derry, New Hampshire. During the drive, COLBY had a five minute phone call with Target Telephone 4, used by GILL-GONZALEZ.[9] This call was corroborated via toll analysis. COLBY informed CW-2 that he was on the phone with his "meth supplier." I believe this further corroborates that GILL-GONZALEZ is COLBY's methamphetamine supplier. Agents surveilled CW-2 return to a meeting location where agents searched CW-2 and CW-2's vehicle for contraband and money with negative results. Agents also retrieved the recording devices. The DEA laboratory confirmed the

---

8 Like the Camry discussed above, the Rio is registered to Xpress Car and Truck Rental and rented by GILL-GONZALEZ's girlfriend, P.M.

9 At the time of the controlled purchase, agents were able identify that GILL-GONZALEZ used Target Telephone 4 through toll analysis and the timing of the calls with surveillance during the controlled purchases.

presence of methamphetamine in the drugs purchased from COLBY and GILL-GONZALEZ. Confirmatory analysis of the suspected fentanyl is still pending.

<u>December 6, 2022: GILL GONZALEZ and COLBY sold four ounces of methamphetamine to CW-2</u>

33.     On December 6, 2022, at the direction of agents, CW-2 arranged a purchase of approximately four ounces of methamphetamine from COLBY and GILL-GONZALEZ for $3,500. CW-2 arranged the controlled purchase with COLBY, who was using telephone number (603) 333-4348. Text messages between CW-2 and COLBY are preserved. The deal was arranged by CW-2 outside the presence of investigators.

34.     Before leaving for the deal, CW-2 confirmed the transaction by calling COLBY. This call was confirmed by toll analysis and a screenshot of CW-2's call log. Prior to the controlled purchase, agents searched CW-2 and CW-2's vehicle for contraband with negative results. Agents provided CW-2 with $3,500 in official agency funds and audio and video recording and surveillance devices. Agents then surveilled CW-2 travel to meet COLBY.

35.     CW-2 met with COLBY and an unidentified male in Derry, New Hampshire. At 8:01 p.m., COLBY, who was using (603) 333-4348, received a call from GILL-GONZALEZ, who was using Target Telephone 4. During the call, as overheard by CW-2, COLBY instructed GILL-GONZALEZ to meet in the parking lot of COLBY's former residence at 6 West Broadway, Derry, New Hampshire. This call was confirmed via toll analysis. I believe that GILL-GONZALEZ instructed COLBY to meet him outside his former residence to supply him with methamphetamine for the deal. Agent surveilled COLBY and CW-2 walk to the residence on foot. During the walk, CW-2 provided COLBY with the $3,500 of agency funds. COLBY left CW-2 by the stairs behind

the building and entered the Rio. Due to the limited lighting, neither the investigators nor CW-2 were able to identify the driver of the Rio. Based on the call between COLBY and Target Telephone 4 and GILL-GONZALEZ's prior use of the Rio, investigators believe that GILL-GONZALEZ drove the Rio to consummate the deal with COLBY. COLBY exited the Rio and met with CW-2 where COLBY provided CW-2 with a bag of approximately four ounces of methamphetamine. I believe GILL-GONZALEZ provided COLBY with methamphetamine to sell to CW-2 in the Rio. COLBY and CW-2 then parted ways.

36.     Agents surveilled CW-2 travel to a meeting location where agents searched CW-2 for contraband and money with negative results. Agents also retrieved the recording devices. The DEA laboratory confirmed the drugs purchased from COLBY and GILL-GONZALEZ  was 110 grams of a substance containing methamphetamine.

<u>January 31, 2023: GILL-GONZALEZ and COLBY sold four ounces of suspected methamphetamine to CW-2</u>

37.     On January 31, 2023, at the direction of agents, CW-2 purchased approximately four ounces of methamphetamine from COLBY and GILL-GONZALEZ for $3,900. CW-2 arranged the controlled purchase with COLBY, who was using telephone number (603) 333-4348. CW-2 arranged the deal with COLBY through a phone call outside the presence of investigators. Text messages between CW-2 and COLBY are also preserved. On January 31, 2023, at 12:28 p.m., CW-2 sent a text message to COLBY stating, "Where are you." COLBY replied, "Mi casa.

44 redfield circle Derry nh. How far." CW-2 did not respond. I believe that COLBY informed CW-2 to meet him at his residence at 44 Redfield Circle in Derry, New Hampshire for the deal.

38.    Prior to the controlled purchase, investigators search CW-2 and CW-2's vehicle for contraband and money with negative results. Investigators provided CW-2 with $4,200 in official agency funds for the controlled purchase. Investigators also equipped CW-2 with audio and video recording and surveillance devices. These recordings are preserved. At 2:36 p.m., agents surveilled CW-2 pick-up COLBY at his residence located at 44 Redfield Circle, Derry, New Hampshire. COLBY then directed CW-2 to a McDonalds restaurant for the drug deal. During the drive, COLBY provided CW-2 with a rock of cocaine base, which CW-2 preserved.

39.    At 2:51 p.m., GILL-GONZALEZ, using Target Telephone 4, called COLBY, who was using phone number (603) 333-4348. This call was confirmed through toll analysis. Upon a review of the recording device, COLBY was overheard during the phone call stating, "You're at the McDonalds?" and "Yo I'm here." At 3:02 p.m., CW-2 and COLBY arrived at a McDonalds in Windham, New Hampshire. I believe that GILL-GONZALEZ called COLBY to confirm that the deal would happen at the McDonalds restaurant. I believe that COLBY confirmed that GILL-GONZALEZ was at the McDonalds and informed GILL-GONZALEZ that he was also there.

40.    Upon arrival, at 3:03 p.m., CW-2 provided $3,900 of the agency funds to COLBY and COLBY exited CW-2's vehicle. CW-2 observed COLBY approach GILL-GONZALEZ, who was the driver of a black Toyota Rav4. The Rav4 is registered to GILL-GONZALEZ's girlfriend.

41.    Investigators observed COLBY and GILL-GONZALEZ enter the McDonalds restaurant. A few minutes later, COLBY exited the McDonalds and entered CW-2's vehicle. Inside the car, COLBY gave CW-2 approximately four ounces of suspected methamphetamine contained

inside a McDonalds bag. At that time, investigators confirmed GILL-GONZALEZ was the driver of the Rav4. I believe that GILL-GONZALEZ supplied COLBY with the methamphetamine for the deal with CW-2.

42.     Following the deal, CW-2 dropped off COLBY at work in Derry, New Hampshire. Investigators then followed CW-2 to a meeting location. CW-2 returned $300 in unused funds and provided the recording devices to agents. CW-2 additionally turned over the suspected methamphetamine from the controlled purchase and a small rock of suspected cocaine base. Investigators then searched CW-2 and CW-2's vehicle for contraband and money with negative results. The drugs purchased from COLBY will be delivered to the DEA laboratory for analysis, which remains pending.

43.     Prior to and following the controlled purchase, at 2:08 p.m. and 3:25 p.m. respectively, investigators observed the Rav4 parked at Target Location 1, the residence of GILL-GONZALEZ.

### January 31, 2023: LUGO DIAZ supplied GILL-GONZALEZ with drugs for the deal between COLBY and CW-2

44.     Investigators reviewed the tolls for Target Telephones 2 and 3 on the date of the above-described drug deal between COLBY and CW-2. Agents corroborated through intercepted communciations that GILL-GONZALEZ used Target Telephone 4 to communicate with drug customers like COLBY and used Target Telephone 3 to communicate with criminal associates like LUGO DIAZ.

45.     At 12:28 p.m., on January 31, 2023 (the date of the deal described in the section above), COLBY, using (603) 333-4348, sent a text message to CW-2 and informed CW-2, "He's

good." I believe that COLBY informed CW-2 that he was ready for the deal because GILL-GONZALEZ (COLBY's supplier) was ready for the deal. Tolls showed that at 11:44 a.m., that morning, LUGO DIAZ, using Target Telephone 2, called GILL-GONZALEZ, who was using Target Telephone 3, for 43 seconds. Based on the timing of calls and surveillance described below, I believe that GILL-GONZALEZ and LUGO DIAZ discussed their ability to supply COLBY with four ounces of methamphetamine. As further discussed below, intercepted communications shows that LUGO DIAZ supplies GILL-GONZALEZ with methamphetamine.

46.     At 2:16 pm., prior to the deal discussed in the section above, agents observed LUGO DIAZ enter his residence at Target Location 2. At 2:29 p.m. and 2:36 p.m., GILL-GONZALEZ, using Target Telephone 3, called LUGO DIAZ, who was using Target Telephone 2. The calls lasted 21 seconds and 10 seconds respectively. At 2:36 p.m., agents observed the Rav4, driven by GILL-GONZALEZ, arrive in the driveway of Target Location 2. After one minute, GILL-GONZALEZ left in the Rav4 for the drug deal with COLBY. Based on the timing of the calls and physical surveillance, I believe that GILL-GONZALEZ called LUGO DIAZ to obtain the methamphetamine from LUGO DIAZ at Target Location 2 before completing the drug deal with COLBY in Windham, New Hampshire.

April 7, 2023: LUGO DIAZ informed GILL-GONZALEZ that he always has methamphetamine available (TT2, Session 82)

47.     On April 7, 2023, at 2:01 p.m., GILL-GONZALEZ, who was using Target Telephone 3, called LUGO DIAZ, who was using Target Telephone 2. GILL-GONZALEZ asked, "You got Cristina? Is there Cristina around?" LUGO DIAZ replied, "Of course. Cristina is always with me." GILL-GONZALEZ reminded LUGO DIAZ, "I called you last time for four and you

didn't have any." LUGO DIAZ asked GILL-GONZALEZ, "I have. Tell me how many you want?" GILL-GONZALEZ asked, "How much would you leave like… three of them? You have to give me a good price – although let me see how much they would pay first because I don't want to be wasting your time." LUGO DIAZ replied, "Alright, then call me back." Based on my training, experience, and other intercepted communications in this investigation, I believe that "Cristina," or "Tina" is slang for methamphetamine. I believe that GILL-GONZALEZ asked if LUGO DIAZ had any methamphetamine available for sale. I believe that LUGO DIAZ informed GILL-GONZALEZ that he always has methamphetamine available. I believe that GILL-GONZALEZ was seeking three units of methamphetamine but would not commit to buying it from LUGO DIAZ until he knew how much his customers would pay for it.

<u>April 7, 2023: LUGO DIAZ informed GILL-GONZALEZ of the prices he charges for</u>

<u>methamphetamine (TT2, Session 83)</u>

48.     On April 7, 2023, at 2:02 p.m., GILL-GONZALEZ, who was using Target Telephone 3, called LUGO DIAZ, who was using Target Telephone 2. GILL-GONZALEZ, stated, "Nah, they only need a 'P' right now." LUGO-DIAZ replied, "They usually buy three at a time. The least I sell it – it's for a dollar, 350." GILL-GONZALEZ replied, "I'm going to tell them 1,350." LUGO DIAZ stated, "Or tell them 14, because if they keep on buying, I'll sell it at 1,350. If it's one, two, three, 10, 20, I'll sell it at that price." GILL-GONZALEZ informed LUGO DIAZ that he will call him back. I believe that LUGO DIAZ informed GILL-GONZALEZ that he typically sells a "P" of methamphetamine for $1,350. Investigators at this time do not know how much quantity is in a "P" of methamphetamine. I believe that LUGO DIAZ changed his mind and instructed GILL-GONZALEZ to tell his customers that he will sell a "P" for $1,400 until they

become consistent customers, at which time he will drop the price to $1,350.

<u>April 7, 2023: GILL-GONZALEZ solicited an unidentified individual to purchase drugs</u>

49.     On April 7, 2023, GILL-GONZALEZ, using Target Telephone 4, had the following

text exchange with an unidentified individual, the user of phone number (978) 601-0603:

> GILL-GONZALEZ (1:27 p.m.): In town for 2-230 coming from peabody need anything
> shoot me a text. (GILL-GONZALEZ sent the same text message to several other telephone
> numbers).

> UI-0603 (1:51 p.m.): Is there any possible way you can come to me first??? Bc Debbie
> won't be around later. I was going to see if you could do 5 and 1 brown for $110.

> UI-0603 (2:31 p.m.): If you want to do the 110 you have to come right now because Gabby
> is having. The baby dropped off in twenty minutes and won't be able to come after. Debbie
> is* So you have to come in the next fifteen twenty minutes or it can't be done.

> UI-0603 continued to message GILL-GONZALEZ to ask him when he was coming. GILL-
> GONZALEZ did not respond until:

> GILL-GONZALEZ (3:53 p.m.):  Took a bit longer because the stuff had to dry I'm hitting
> highway now.

> UI-0603 (4:14 p.m.): I need 2 hard 1 brown 70. Too late for Deb now.

50.     I believe that GILL-GONZALEZ solicited his drug customers to order from him

because he would be available to make drug sales starting around 2:00 or 2:30 p.m. I believe that

UI-0603 is a drug customer and ordered 5 grams of cocaine base and 1 gram of fentanyl ("5 and 1

brown") for $110. I believe that GILL-GONZALEZ was late because he was waiting for the

cocaine base to dry after it had been cooked from powder cocaine ("Took a bit longer because the

stuff had to dry."). I believe that UI-0603 then changed the order to 2 grams of cocaine base and 1

gram of fentanyl ("2 hard 1 brown") for $70 because another customer "Deb" was now

unavailable.

<u>April 7, 2023: GILL-GONZALEZ delivered drugs to COLBY (TT4 Session 1557)</u>

51.      On April 7, 2023, at 7:12 p.m., GILL-GONZALEZ, using Target Telephone 4, called COLBY, who was phone number (603) 333-4348. The following conversation was intercepted.

> COLBY: "Yo"
>
> GILL-GONZALEZ: "Yo I'm like 5 minutes away."
>
> COLBY: "F**k alright.
>
> GILL-GONZALEZ: "What do you mean"
>
> COLBY: "I was gonna meet you"
>
> GILL-GONZALEZ: "I'm already five minutes away bro."
>
> COLBY: "F***ing A bro uhh"
>
> GILL-GONZALEZ: "I'm already passing the - I'm already passing the Shell."
>
> COLBY: "Let me know - let me know before you pull in."
>
> GILL-GONZALEZ: "Alright bro five minutes [unintelligible] I brought you a zip and a ball."
>
> COLBY: "Huh?"
>
> GILL-GONZALEZ: "I brought you a zip and a ball."
>
> COLBY: "Ah f**k alright."

Based on my training, experience, and knowledge of this investigation, I believe that GILL-GONZALEZ called COLBY to deliver him one ounce and 3.5 grams of cocaine ("a zip and a ball").

### April 11, 2023: GILL-GONZALEZ and COLBY sold four ounces of suspected methamphetamine to CW-2

52.     On April 11, 2023, at the direction of agents, CW-2 purchased approximately four ounces of methamphetamine from COLBY and GILL-GONZALEZ for $3,300. CW-2 arranged the controlled purchase with COLBY, who was using telephone number (603) 333-4348. CW-2 arranged the deal with COLBY through a phone call outside the presence of investigators. Text messages between CW-2 and COLBY are also preserved. COLBY arranged for CW-2 to meet him at his residence at 44 Redfield Circle in Derry, New Hampshire for the deal.

53.     Prior to the controlled purchase, investigators search CW-2 and CW-2's vehicle for contraband and money with negative results. Investigators provided CW-2 with $4,200 in official agency funds for the controlled purchase. Investigators also equipped CW-2 with audio and video recording and surveillance devices. These recordings are preserved.

54.     At 1:48 p.m., GILL-GONZALEZ, using Target Telephone 4, called COLBY, who was using (603) 333-4348. GILL-GONZALEZ asked, "What do you need exactly? So I can make sure I have it. So I can put it aside." COLBY replied, "Two *nieve* (Spanish meaning, Snow), two hard, and then… A bottle and a half." GILL-GONZALEZ replied, "I got them Xans too. I'll give them to you. I have a couple left. I can give them to you like at 250." COLBY responded, "Alright." GILL-GONZALEZ stated, "So just let me know. Do you want me to bring you any?" COLBY asked, "Wait. What is it?" GILL-GONZALEZ stated, "Xans." COLBY replied, "No. But maybe

some Tina." GILL-GONZALEZ asked, "Some Tina? How much Tina?" COLBY stated, "I don't know. He's going to call me back when [unintelligible]." I believe that GILL-GONZALEZ offered to supply COLBY with narcotics. I believe that COLBY initially ordered cocaine ("nieve") and cocaine base ("hard"). I believe that GILL-GONZALEZ also offered to sell Xanax pills ("Xans"). I believe that COLBY declined, but ordered methamphetamine for CW-2 ("Tina"). I believe that COLBY was waiting for CW-2's order before informing GILL-GONZALEZ.

55.     At 2:06 p.m., COLBY, using (603) 333-4348, called GILL-GONZALEZ, who was using Target Telephone 4. COLBY stated, "Yo. A quap." GILL-GONZALEZ clarified, "A quarter? Of Tina?" COLBY stated, "Yeah." GILL-GONZALEZ informed COLBY that he would check his inventory and to "Just send him down." I believe that COLBY conveyed CW-2's order of four ounces of methamphetamine (a "quarter pound" of "Tina.") to GILL-GONZALEZ. I believe that GILL-GONALEZ informed COLBY to confirm the deal with CW-2.

56.     At 3:41 p.m., agents observed GILL-GONZALEZ leave his residence at Target Location 1 in a gray Acura MDX, bearing Massachusetts registration 1WRF66 (the "Acura MDX"). At 3:40 p.m., GILL-GONZALEZ, who was using Target Telephone 4, sent a text message to COLBY, who was using (603) 333-4348, stating, "93." COLBY responded, "Here." I believe that GILL-GONZALEZ informed COLBY that he was en-route to his residence via Interstate 93 and that COLBY confirmed that he was home.

57.     At 3:43 p.m., agents surveilled CW-2 travel to COLBY's residence. Upon arrival, COLBY exited the residence carrying a bag and entered the front passenger seat of CW-2's vehicle. An unidentified male and female approached CW-2's vehicle. COLBY indicated to CW-2 that the male was his landlord and the female was the landlord's girlfriend. CW-2 observed

COLBY hand the female a napkin that appeared to contain cocaine base.  COLBY also appeared to have cocaine contained inside an Altoids mints tin.

58.     At 4:20 p.m., GILL-GONZALEZ arrived and parked behind CW-2's vehicle. COLBY exited CW-2's vehicle and entered GILL-GONALEZ's vehicle. A moment later, CW-2 exited CW-2's vehicle and approached COLBY. Outside of GILL-GONZALEZ's vehicle, CW-2 handed COLBY $3,300 of recorded agency funds through the car window. CW-2 returned to CW-2's vehicle and waited for COLBY to return. Upon his return, COLBY entered CW-2's vehicle and provided a clear bag of a crystal-like substance believed to be approximately four ounces of methamphetamine. CW-2 asked COLBY for extra bags and COLBY instructed CW-2 to follow him into the garage. COLBY briefly went into the residence and returned with plastic bags for CW-2.

59.     Following the deal, CW-2 left COLBY's residence. Investigators then followed CW-2 to a meeting location. CW-2 returned $900 in unused funds and provided the recording devices to agents. CW-2 additionally turned over the suspected methamphetamine from the controlled purchase. Investigators then searched CW-2 and CW-2's vehicle for contraband and money with negative results. The drugs purchased from COLBY will be delivered to the DEA laboratory for analysis, which remains pending.

April 15, 2023: LUGO DIAZ directed drug supplier to send a courier to Target Location 2 (TT2, Sessions 691 and 702)

60.     On April 15, 2023, at 10:23 p.m., LUGO DIAZ, using Target Telephone 2, called J.V., who was using (978) 457-9964. Based on communications intercepted over Target Telephones 2 and 3, I believe that J.V. is a cocaine supplier to LUGO DIAZ  and GILL-

GONZALEZ. LUGO DIAZ stated, "Brother, I was counting the money there, in the parking lot, and was going to get out and give it to him. But I don't know. How come he didn't see the detective? Driving by over one hundred times." J.V. stated, "Ok." LUGO DIAZ stated, "Tell him to head over to my house. Tell him to go to my house. That's why I drove by very quickly too." LUGO DIAZ continued, "Tell him to go to my house. Do you know the address? Oxford." I believe that LUGO DIAZ was planning to meet one of J.V.'s couriers to obtain an amount of cocaine. I

further believe that LUGO DIAZ left the intended meeting area because there was a police detective circling the area.

61.     Later that night, at 10:56 p.m., LUGO DIAZ, using Target Telephone 2, again called J.V.

LUGO DIAZ: Send him that address. It's for my house. It's better that he goes to the house.

J.V.: That he goes to your house?

LUGO DIAZ: But what I was doing was… just in case anything happens… because I stopped for a little while.

J.V.: It's already going to be a month. Why are you so slow? You don't have any people?

LUGO DIAZ: No. The truth sir. I'm telling you the truth. You remember I had a bracelet?

J.V.: "Oh. Yes, yes, yes."

LUGO DIAZ: Now when I started, how was I going to do something crazy? And they would get me with something, that's why.

J.V.: Okay, okay.

LUGO DIAZ: So now all the people I had before are slowly coming back. I told them that I got off the bracelet. So now they're calling me.

J.V.: Ok. That's why you're a bit slower.

LUGO DIAZ: Uh-huh. That's the reason. If not, I'd have a million.

J.V.: Of course. Alright, alright.

LUGO DIAZ: Tell him that… Send him the address now, so he can go to my house.

J.V.: Ok.

I believe that LUGO DIAZ again informed J.V. to send his courier to Target Location 2 for a drug deal. I believe that J.V. questioned why LUGO DIAZ had not ordered drugs from him for a whole month. I believe that LUGO DIAZ explained to J.V. that he was ordered to wear a GPS bracelet

as part of his pretrial conditions of release in a pending state court matter and that LUGO DIAZ

was being careful. LUGO DIAZ recently had the bracelet removed as a conditions of pretrial

release. I believe that LUGO DIAZ informed J.V. of the development and that his customers are

coming back to him now that his bracelet is removed.

<u>April 17, 2023: COLBY arrested after obtaining drugs from GILL-GONZALEZ</u>

62.     On April 17, 2023, at 6:43 p.m., COLBY, using (603) 973-1992, called GILL-

GONZALEZ, who was using Target Telephone 4. GILL-GONZALEZ instructed COLBY to meet

him at the mall. Based on the investigation and experience, investigators believed that GILL-

GONZALEZ directed COLBY to meet him at the Rockingham Mall in Salem, New Hampshire.

Investigators established surveillance of the mall to observe this meeting.

63.     At 6:52 p.m., COLBY, using (603) 973-1992, called GILL-GONZALEZ, who was

using Target Telephone 4. COLBY directed GILL-GONZALEZ to let him know when he was 10

minutes away. COLBY ordered "100 and the half." GILL-GONZALEZ agreed. I believe that

COLBY ordered $100 worth of an unidentified drug ("100") and five grams of fentanyl ("the

half").

64.     At 7:37 p.m., COLBY, using (603) 973-1992, called GILL-GONZALEZ, who was

using Target Telephone 4. GILL-GONZALEZ asked if COLBY was in a "black pickup truck."

COLBY stated that he was at the crosswalk and GILL-GONZALEZ indicate that he saw COLBY.

Investigators observed COLBY in the front passenger seat of a black Chevy Equinox (an SUV,

not a pickup truck) in the mall parking lot. Agents watched COLBY exit the Equinox and enter

GILL-GONZALEZ's vehicle. A moment later, COLBY re-entered the Equinox and drove away.

Based on the seizure discussed below, I believe that GILL-GONZALEZ provided COLBY with drugs at their meeting. Agents followed the Equinox and stopped the car in Derry, New Hampshire.

65.     An investigator who approached COLBY in the passenger seat observed a tan powdery substance in a plastic bag on the floorboard near COLBY's feet. Officers then ordered COLBY and the driver out of the car and seized approximately 8.2 grams of suspected fentanyl. Agents also seized a blue zippered bag from COLBY containing $2,700. COLBY also had an Altoids tin with a small amount of cocaine base inside. Officers arrested COLBY and the driver, and both posted bail that night. COLBY will be summonsed to state court for possession of controlled substances.

66.     I later took possession of the four cellphones that were seized from the vehicle incident to COLBY's arrest. I called (603) 978-1992 and one of the cellphones rang. The other three cellphones were powered down at the time I took possession of them.

67.     On April 19, 2023, agents intercepted communication over Target Telephone 4 between COLBY and GILL-GONZALEZ. GILL-GONZALEZ requested that COLBY contact him via Snapchat

**Drug Traffickers' Use of Residences and Cell Phones Generally**

68.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

  a.   Controlled substances.

  b.   Paraphernalia and tools for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-

sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, presses, dies, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact

29

lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

69.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.

70.     Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.   I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

71.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence and/or their vehicle.  Such documents include rental or storage property agreements and receipts.

72.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

73.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

74.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

75.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location.  It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant others.  This is done in an effort to thwart law enforcement detection.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification

evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of controlled substances is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

76.     Based on my training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug traffickers, such

as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug traffickers' residences.

77.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

78.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that drug traffickers regularly keep records of their illegal activities.  These

records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 on their cellular telephones.

79.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via telephone, text messages, and the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

80.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

      a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

      b.   Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

      d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

81.    I know from my training and experience, that many cellular telephones now offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called a biometric lock.

82.    If a user enables the biometric lock, he or she can register fingerprint(s) that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the

device by pressing the relevant finger(s) to the device's fingerprint sensor.  In my training and experience, users of biometric locks often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

83.     In some circumstances, a fingerprint cannot be used to unlock a device that has a biometric lock enabled, and a passcode must be used instead. For example, if the device has not been unlocked for a period of time, or due to a periodic requirement to use the passcode.  Thus, in the event law enforcement encounters a locked smartphone device, the opportunity to unlock the device via the fingerprint sensor exists only for a short time.  A biometric lock may also not work to unlock the device if for example, (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

84.     I am also aware that even more recent smartphone devices no longer use a biometric lock and instead use a facial recognition security feature.  Facial recognition systems use the smartphone's camera to scan the face of the user and, if the scan matches the data on file, performs actions like unlocking the smartphone.

85.     The passcodes that would unlock these devices are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's fingerprint sensor or use the device's camera to access the facial recognition security feature in an attempt to unlock the device for the purpose of executing the search authorized by these warrants.  Attempting to the unlock device with the use of the fingerprints of the user or use the device's camera and take

a scan of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the search authorized by these warrants.

86.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachments B-1 and B-2 will be found at the Target Locations described in Attachments A-1 and A-2.

## CONCLUSION

87.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Locations, as described in Attachments A-1 and A-2 there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachments B-1 and B-2.  Accordingly, I respectfully request that search warrants be issued for the search of the Target Locations.

88.     Disclosure of the contents of the applications, affidavit, and search warrants could compromise and jeopardize this ongoing investigation by allowing GILL-GONZALEZ, LUGO DIAZ, COLBY, or LANE to flee and/or destroy evidence.  For that reason, I request that the applications, affidavit, and search warrants be sealed until further order of the Court.

Respectfully submitted,

/s/ Bryan J. Axelrod

_____

Bryan J. Axelrod
Special Agent
Federal Bureau of Investigation

Attested and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on April 20, 2023.



_____

Hon. M. Page Kelley
Chief United States Magistrate Judge
District of Massachusetts

**ATTACHMENT A-1**

**(Location to be searched)**

4 Allyn Terrace, Lawrence, Massachusetts ("Target Location 1") is single-family residential building. The property to be searched includes the curtilage of the residence including the driveway and detached garage.

Target Location 1 has a red and tan exterior. The number "4" is affixed to the left side of the front door. A garage is located at the rear of the driveway, which is to the left of the building. A photograph of Target Location 1 is attached.



**ATTACHMENT A-2**
**(Location to be searched)**

83 Oxford Street, Lawrence, Massachusetts ("Target Location 2") is a single-family

residential building. The property to be searched includes the curtilage of the residence,

including the driveway.

Target Location 2 has an off-white exterior. The number "83" is affixed to a post on the

right side of the overhang to the front door. A photograph of the building is attached.



**ATTACHMENT B-1**

**(Items to be seized from Target Location 1)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1.      Controlled substances.

2.      From September 2022 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.      Cash, currency, and currency counting machines, and records from September 2022 to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.      From September 2022 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

6.      From September 2022 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the

subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators, including surveillance video storage hardware or devices.

8.     Cellular telephones, computers, and other electronic storage media belonging to or used by Esaias GILL-GONZALEZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

  a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

  b.     From September 2022 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

  c.     From September 2022 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

  d.     From September 2022 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

  e.     From September 2022 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

  f.     From September 2022 to the present, GPS data;

  g.     From September 2022 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug

trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.      From September 2022 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.       All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.       Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Esaias GILL-GONZALEZ to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of Esaias GILL-GONZALEZ for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B-2**

**(Items to be seized from Target Location 2)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1.  Controlled substances.

2.  Paraphernalia and tools for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, presses, dies, and substances used to "cut" or dilute illegal narcotics.

3.  From September 2022 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

5.  Cash, currency, and currency counting machines, and records from September 2022to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.  From September 2022 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets,

instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7.      From September 2022 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.      Cellular telephones, computers, and other electronic storage media belonging to or used by Domingo LUGO DIAZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

b.      From September 2022 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.      From September 2022 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

d.      From September 2022 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

e.      From September 2022 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

f.      From September 2022 to the present, GPS data;

g.      From September 2022 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.      From September 2022 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Domingo LUGO DIAZ to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of Domingo LUGO DIAZ for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.